1    UNITED STATES DISTRICT COURT
2    DISTRICT OF PUERTO RICO
3
4

UNITED STATES OF AMERICA,

    Plaintiff,

    v.

EDWIN BERNARD ASTACIO-ESPINO
[2], LUIS RIVERA-CARRASQUILLO [3],
and RAMON LANZA-VAZQUEZ [18],

    Defendants.

Criminal No. 3:12-CR-00200 (JAF)

5
6

7    **MEMORANDUM OPINION**

8    **I.**
9    **Introduction**

10    This matter came before the court on November 20, 2015, for an evidentiary hearing to

11    determine whether the courtroom was closed to the public during the jury selection on

12    October 25, 2013, for the trial of Defendants Edwin Bernard Astacio-Espino (2), Luis D. Rivera-

13    Carrasquillo (3), and Ramón Lanza-Vázquez (18).  After originally denying the request for a

14    hearing, this court granted Defendants' motion for reconsideration (ECF No. 1702) and their

15    request to be present at the evidentiary hearing (ECF No. 1708).  For the reasons set forth below,

16    the court finds that the courtroom was not closed, neither partially nor completely, on

17    October 25, 2013.

**II.**

**Jurisdiction**

Defendants Edwin Bernard Astacio-Espino (2), Luis D. Rivera-Carrasquillo (3), and Ramón Lanza-Vázquez (18) moved pursuant to Fed. R. App. P. 10(c) and 10(e)(2). (ECF No. 1694). Federal Rule of Appellate Procedure 10(c) does not apply, since the parties did not provide a statement of the evidence with objections or amendments for this court's approval. Nothing was omitted from the record by "error or accident," thus, Fed. R. App. P. 10(e)(2) does not apply. Accordingly, this court denied Defendants' original request. (ECF No. 1695).

Thereafter, Defendants moved for reconsideration, again asserting a need to supplement the record pursuant to Fed. R. App. P. 10(c) and 10(e)(2). (ECF No. 1697). Although the Court of Appeals now has jurisdiction over this case, Rule 10(e) allows a trial court to consider a dispute as to the record even while an appeal is pending. *United States v. Pagán-Ferrer*, 736 F.3d 573, n.2 (1st Cir. 2013). The rule does not require the court to hold an evidentiary hearing, rather only to "settle the matter" when necessary. *Id*. at 582. After careful consideration, this court granted Defendants' motion for reconsideration in an effort to provide the Court of Appeals with the fullest picture on direct appeal. (ECF No. 1702).

**III.**

**Background**

This case stems from a large multi-defendant RICO matter that has been the subject of various trials and appeals since 2012. The First Circuit previously set forth the background of the underlying matter and, rather than reinvent the wheel, we use the following excerpt from *United States v. Ramirez-Rivera*, 800 F.3d 1 (1st Cir. 2015).

Until 2004, the majority of street-level drug sales in the San Juan-metropolitan area of Puerto Rico were controlled by gangs operating out of public housing projects. Sales in each housing project were generally controlled by each project's own drug gang.

The name of the game back then was control of the drug points, and the gangs fought for decades to maintain and grow their territories. The violence that accompanied their disputes naturally drew the attention of both local and federal authorities. As a result, drug sales took a hit, and large conspiracy indictments were handed down.

Around 2004, nearly all the drug gang leaders from the area reached an agreement that to reduce the inter-project conflicts and keep the cops away, they would form an alliance. They named it "La Organización de Narcotraficantes Unidos" (Spanish for "The Organization of United Drug Traffickers"), or "La ONU" for short. The leaders agreed that if a conflict arose among La ONU members, they would meet to discuss it (as opposed to immediately resorting to shootouts). Under the new regime, La ONU members would be permitted to visit other La ONU-affiliated housing projects (and to also sell drugs there), so long as they got permission from that project's leader. The La ONU leaders also met regularly to discuss drug-related issues and to resolve conflicts.

While the alliance operated "for a time," for reasons unknown it "weakened" as certain gangs grew "disgruntled" with La ONU and "sought to break off." Sometime around 2008, La ONU ended up breaking into two groups—La ONU and "La Rompe ONU" (known as "La Rompe" for short, which translates to "the break"). Each project-gang went all-in with either La ONU or La Rompe. La ONU-controlled projects included Las Dalias, Las Gladiolas, El Prado, and Los Jardines de Selles, while La Rompe-controlled projects included Trujillo, Cupey, and Alturas de Cupey. The two factions soon became equally sized and eventually, they became bitter rivals.

With the rising of La Rompe, La ONU's direction changed. Its mission became to "maintain control over the drug points in their housing projects by force and to kill La Rompe members and leaders in order to expand." The organization's "unwritten" rules required that La ONU members remain loyal to each other, while relentless to the enemy. La ONU members could not kill other La ONU members without go-ahead from the leadership; nor could they overtake La ONU-owned drug points. Not only were La ONU members forbidden from associating with La Rompe members, they were also required to kill them on-sight. La ONU members were not permitted to cooperate with law enforcement. And breaking any of these rules meant death to the traitor (and/or his family members).

La ONU leaders continued to meet with each other to resolve internal conflicts and discuss strategy for overtaking drug points at other (La Rompe-controlled) housing projects. They regularly pooled resources to buy weapons and cars. When attacks on La

Rompe members would go down, each La ONU project contributed an enforcer (i.e., hit man).

La ONU also continued to traffic drugs (crack, cocaine, heroin, and marijuana) and committed various violent acts (including murders) to enforce its rules and grow its territory. For instance, La ONU put hits out on La Rompe leaders. La ONU launched machine-gun shootouts in La Rompe projects. During one such shootout near Trujillo Alto Bridge, two women—a police officer and librarian—were killed. La ONU was also connected to the May 2010 shooting take-down of a police helicopter, allegedly committed by Edwin Bernard Astacio Espino ("Bernard"), a La ONU member.

Betraying La ONU called for an equally devastating fate. For instance, when a La ONU member stole a gun and gave it to a La Rompe member, he too, was killed. So was a La ONU leader who got caught stealing drugs from the organization, and a member who cooperated with police.

After the helicopter shooting, an arrest warrant was issued for Bernard (whom the police apparently could not find). The police caught a lucky break in August 2010, when an informant tipped them off that Bernard was hiding out at Cruz–Ramos's house, stashing weapons and drugs. Afraid they would miss the chance to arrest Bernard if they waited any longer, the police searched Cruz–Ramos's house (without a warrant), found Bernard, arrested him (and the several other people in the house, including Cruz–Ramos), and seized the drugs and guns they found at the home. Police also arrested other La ONU members for various crimes around 2010 to 2011.

The Crackdown

With that, in March 2012, a grand jury indicted 33 people for their alleged involvement in La ONU from 2004 through March 2012. The charges included drug trafficking, firearms crimes, murder, and attempted murder. The indictment accused all the Defendants of being members of La ONU.

*Ramirez-Rivera*, 800 F.3d at 12-14 (footnotes omitted).

The Defendants here were charged with twenty-three (23) of the thirty-three (33) counts

in the supplemental indictment (ECF No. 196):

Count 1: racketeering conspiracy from 2004 through March 2012, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d);

Count 2: conspiracy to possess with intent to distribute a controlled substance, in violation of 21 U.S.C. §§ 846 and 860;

Count 3: conspiracy to possess firearms during and in relation to narcotics trafficking offenses, in violation of 18 U.S.C. § 924(o);

Count 4: commission of a violent crime in aid of racketeering activity (Murder of Orlando Medina Serrano), in violation of 18 U.S.C. § 1959(a)(1) and 2;

Count 5: use and carry of a firearm in relation to a crime of violence (Murder of Orlando Medina Serrano), in violation of 18 U.S.C. §924(c)(1)(A), and 924(j)(1), and 2;

Count 6: commission of a violent crime in aid of racketeering activity (Murder of Angel Gonzalez Villanueva, a/k/a "Chaple"), in violation of 18 U.S.C. § 1959(a)(1) and 2;

Count 7: use and carry of a firearm in relation to a crime of violence (Murder of Angel Gonzalez Villanueva, a/k/a "Chaple"), in violation of 18 U.S.C. §924(c)(1)(A), and 924(j)(1), and 2;

Count 8: commission of a violent crime in aid of racketeering activity (Murder of Luis Antonio De Jesús Pérez), in violation of 18 U.S.C. § 1959(a)(1) and 2;

Count 9: use and carry of a firearm in relation to a crime of violence (Murder of Luis Antonio De Jesús Pérez), in violation of 18 U.S.C. §924(c)(1)(A), and 924(j)(1), and 2;

Count 17: commission of a violent crime in aid of racketeering activity (Murder of Jesús Quiñones Santiago), in violation of 18 U.S.C. § 1959(a)(1) and 2;

Count 18: destruction of aircraft – damage, destroy, disable, and wreck, in violation of 18 U.S.C. §32(a)(1) and 34;

Count 19: drive by shooting (Murder of Jesús Quiñones Santiago), in violation of 18 U.S.C. §36(b)(2)(A) and 1111(a);

Count 20: use and carry of a firearm in relation to a crime of violence (Murder of Jesús Quiñones Santiago), in violation of 18 U.S.C. §924(c)(1)(A) and (B) and 924(j)(1);

Count 21: commission of a violent crime in aid of racketeering activity (Attempted Murder of ICE TFO José Rivera Quinones, Eduardo Alvelo Meléndez, and Shakira Vázquez Nieves), in violation of 18 U.S.C. §1959(a)(5);

Count 22: destruction of aircraft – act of violence, in violation of 18 U.S.C. §32(a)(6);

Count 23: use and carry of a firearm in relation to a crime of violence (Attempted Murder of ICE TFO José Rivera Quinones, Eduardo Alvelo Meléndez, and Shakira Vázquez Nieves), in violation of 18 U.S.C. §924(c)(1)(A) and (B);

Civil No. 3:12-CR-00200 (JAF)                                              -6-

Count 24: illegal possession of a machinegun, in violation of 18 U.S.C. §922(o) and 924(a)(2);

Count 25: commission of a violent crime in aid of racketeering activity (Murder of PR Police Officer Blanca Nanette De Los Santos Barbosa), in violation of 18 U.S.C. §1959(a)(1) and (2);

Count 26: commission of a violent crime in aid of racketeering activity (Murder of Manuel Medina Rivera), in violation of 18 U.S.C. §1959(a)(1) and (2);

Count 27: drive by shooting (Murder of PR Police Officer Blanca Nanette De Los Santos Barbosa and Manuel Medina Rivera), in violation of 18 U.S.C. §36(b)(2)(A) and 1111(a) and 2;

Count 28: use and carry of a firearm in relation to a crime of violence (Murder of PR Police Officer Blanca Nanette De Los Santos Barbosa and Manuel Medina Rivera), in violation of 18 U.S.C. §924(c)(1)(A), 924(j)(1), and 2;

Count 29: violent crime in aid of racketeering activity, in violation of 18 U.S.C. § 1959(a)(1) (specifically, for the August 2010 murder of Christian Toledo–Sánchez, known as "Pequeque");

Count 30: use and carry of a firearm in relation to a crime of violence (i.e., Pequeque's murder), in violation of 18 U.S.C. §§ 924(c)(1)(A) and 924(j)(1); and

Count 31: knowing transfer of a firearm for use in a crime of violence (specifically, for the August 2010 murder of Christian Toledo-Sánchez, known as "Pequeque"), in violation of 18 U.S.C. §924(h).

Prior to trial, the defendants were split into groups.[1]  The undersigned conducted jury selection and presided over the trial of Defendants Edwin Bernard Astacio-Espino (2), Luis D. Rivera-Carrasquillo (3), and Ramón Lanza-Vázquez (18).  We began jury voir dire on October 25, 2013, with a venire of ninety-four (94) persons.  The court empaneled an anonymous jury. The instant defendants and their trial attorneys were present during jury selection. The jury panel, including alternates, was sworn in on October 25, 2013, and the trial began on October 28, 2013.

---

[1] Due to the large number of multi-defendant litigation in this district, it is customary to split multi-defendant cases into groups for trial so that each trial consists of a potential maximum of 10-12 defendants.

1    At the close of the Government's case, the Defendants moved for Criminal Rule 29

2    judgments of acquittal, which this court denied.   Defendants later renewed their Rule 29

3    motions, and this court again denied the motions.  The jury returned guilty verdicts on all counts

4    on November 12, 2013. (ECF No. 1330). On April 30, 2014, the district court sentenced

5    Mr. Lanza to life imprisonment on one count, and ten years consecutive on another. (ECF

6    No. 1494). Mr. Astacio was sentenced on May 16, 2014, to fifteen life terms, concurrent with

7    one count of ten years and one of twenty years, plus special assessments. (ECF No. 1507).  On

8    June 2, 2014, we imposed sentence on Mr. Rivera comprising nine concurrent life terms (and

9    one of ten years), plus special assessments. (ECF No. 1518).

10    Defendants appealed their convictions. *United States v. Lanza-Vazquez*, *appeal docketed*,

11    No. 14-1582 (1st Cir. Jun 4, 2014), *United States v.  Astacio Espino*, *appeal docketed*, No. 14-

12    1631 (1st Cir. Jun 16, 2014), *United States v. Rivera-Carrasquillo*, *appeal docketed*, No. 14-

13    1715 (1st Cir. Jun 30, 2014) (consolidated). On April 23, 2015, the First Circuit Court of

14    Appeals set a joint briefing schedule with an initial due date for the appellants' briefs of June 2,

15    2015. The due date for the opening briefs and their joint appendix was later extended to

16    October 6, 2015.

17    Shortly after its Order setting the joint briefing schedule, the First Circuit issued its

18    opinion in *United States v. Negrón-Sostre*, 790 F.3d 295 (1st Cir. 2015), which held that a

19    complete courtroom closure during jury selection before U.S. District Court Judge Francisco

20    Besosa constituted clear and obvious error. Thereupon, appellate counsel for Defendants began

21    investigating whether a closure of the courtroom occurred during jury selection on October 25,

22    2013. Having found nothing in the transcript to indicate that the courtroom had been closed

1    during jury selection, counsel then spoke with family members of the Defendants through

2    José C. Morin, a paralegal employed by appellate counsel for Defendant Astacio.  As a result of

3    those conversations, Defendants moved this court under Fed. R. App. P. 10(c) and (e) to hold an

4    evidentiary hearing in order to supplement the record and to determine whether the courtroom

5    had, in fact, been closed during jury selection.  In light of this court scheduling an evidentiary

6    hearing, the First Circuit suspended the joint briefing schedule.  See *Lanza-Vazquez*, 1st Cir.

7    No. 14-1582, at Document 00116908544, Entry ID 5948538.

8          This court held an evidentiary hearing on November 20, 2015.  Defendants Edwin

9    Bernard Astacio-Espino (2), Luis D. Rivera-Carrasquillo (3), and Ramón Lanza-Vázquez (18)

10   were present at the hearing.  Defendants' appellate counsel were also present at the hearing.

11   Additionally, Defendants hired a local attorney, María Sandoval, to present and participate at the

12   evidentiary hearing.  Defendants called six witnesses:   Betzaida Caballero, former girlfriend of

13   Ramón Lanza-Vázquez; Héctor Rivera-Rosa, father of Luis Rivera-Carrasquillo; Maribel

14   Carrasquillo, mother of Luis Rivera-Carrasquillo; Attorney José Aguayo, defense trial counsel

15   for Ramón Lanza-Vázquez; Francisca Espino, mother of Edwin Bernard Astacio-Espino, and

16   Juan Carlos Ramos-Piñeiro, brother of co-defendant Jean Carlos Ramos-Piñeiro and friend of

17   Ramón Lanza-Vázquez and Luis Rivera Carrasquillo.  Defendants also submitted the affidavit

18   of Attorney Lydia Lizarribar, who was defense trial counsel for Luis Rivera-Carrasquillo.

19   Thereafter, the Government called Héctor Villavicencio and Ana Romero, the Court Security

20   Officer ("CSO") and the Courtroom Deputy Clerk, respectively, assigned to the courtroom on

21   the day of jury selection.

1          The court entered into evidence as court's exhibits, five pictures of the courtroom setup

2    used in Courtroom #7 during jury selection in multi-defendant or high-profile cases. (ECF

3    No. 1724).   The record is further supplemented by a memorandum from the Clerk's Office

4    Project Manager regarding Courtroom #7 measurements and seating capacity. (ECF No. 1727).

5          Defendants have also moved for two additional supplements to the record. (ECF

6    Nos. 1726 and 1728).  First, Defendants request the U.S. Marshals Service's security plan for

7    the October 25, 2013, trial, along with the assignment sheet or list of CSOs and Deputy U.S.

8    Marshals scheduled to assist in the jury trial on October 25, 2013. (ECF No. 1726 at 5).  Second,

9    Defendants seek to supplement the record by adding an affidavit of Attorney María Sandoval.

10         In its opposition to the motion, the Government remains cognizant of the matter at hand:

11   Whether members of the public were excluded from the courtroom on October 25, 2013. (ECF

12   No. 1729).  Although this court agrees with the Government that Defendants' requests well

13   exceed the scope of the evidentiary hearing, for the purpose of transparency we have entertained

14   Defendants requests.  With respect to the U.S. Marshals Service security plan, such document is

15   confidential and, per the Department of Justice, it cannot be disclosed.  In lieu of the security

16   plan, the U.S. Marshals Service provided a synopsis of the plan which includes the salient

17   points.  The letter confirms that CSO Villavicencio was the only CSO scheduled to work in

18   Courtroom #7 during this jury selection and that no Deputy U.S. Marshals or CSOs were posted

19   outside the courtroom.  The U.S. Marshal's letter is docketed as a SEALED document at ECF

20   No. 1730 and will be available only for review by the Court of Appeals.

21         Finally, with respect to Attorney Sandoval's affidavit, we see no basis for supplementing

22   the record with her statement as she was not present during the jury selection on October 25,

1    2013, and cannot, in fact, shed any light on the issue of the closure of the courtroom.  However,

2    we will allow her affidavit to supplement the record and will give it the appropriate weight

3    when, and if, applicable to our analysis.

4          Accordingly, Defendants' Motion to Supplement the Record (ECF No. 1726) is

5    DENIED, and Defendants' Second Motion to Supplement the Record (ECF No. 1728) is

6    GRANTED.

7                                              **IV.**
8                              **Presentation of Evidence**

9    **A.     Affidavit of José C. Morin (ECF No. 1697-1)**

10         After this court denied their initial request for an evidentiary hearing on the instant issue,

11   Defendants moved the court to reconsider and attached to their motion the Affidavit of José C.

12   Morin. (ECF No. 1697-1).  In his affidavit, Mr. Morin, a paralegal employed by Defendant

13   Astacio's appellate counsel, asserts that **on August 28, 2015**, he spoke with Francisca Espino,

14   Héctor Rivera, Maribel Carrasquillo, and Juan Carlos Ramos-Piñeiro. The court will not

15   summarize the affidavit here as it is readily accessible on the docket but will address it as

16   needed in the analysis.

17         The witnesses' evidentiary hearing testimony is summarized as follows.

18   **B.     Betzaida Caballero**

19         Ms. Caballero is the mother of Defendant Ramón Lanza-Vázquez's two daughters,

20   currently ages eleven and seven.  She has known Defendant Lanza since 2001 and became

21   engaged in a romantic relationship with him in 2002.  At the time of the trial in 2013,

1   Ms. Caballero considered herself to be Defendant Lanza's "wife", and she is aware that he is

2   currently sentenced to serve the remainder of his life in prison.

3       Ms. Caballero is familiar with the procedure for entering the courthouse.  In addition to

4   the 2013 trial, she also witnessed Defendant Lanza's trial in 2011, at which a jury convicted him

5   of conspiracy to distribute narcotics and distribution of narcotics. (*See* P.R.D. Case No. 3:07-cr-

6   00547 at ECF No. 1038).  Despite Defendant Lanza having been arrested in 2007 at

7   Ms. Caballero's residence, she testified that she had no knowledge of his illegal activities.

8   Ms. Caballero continued her relationship with Defendant Lanza after his arrest in 2007, during

9   his incarceration pending the 2011 trial, after the court sentenced him to 240 months, and

10  throughout the trial of this case.  According to Ms. Caballero, she no longer considers herself in

11  a relationship with Defendant Lanza other than that he is the father of two of her daughters.

12      With respect to the events of October 25, 2013, Ms. Caballero testified that she arrived at

13  the courthouse around 8:00 or 8:30 a.m., checked in with security, then proceeded to the

14  cafeteria.   Around 9:00 a.m., she went to the courtroom, but it was still closed since no

15  proceedings had started.  She then waited outside the courtroom doors for another thirty to forty

16  minutes, until the doors were unlocked.  As she approached the doors, a person identified as a

17  U.S. Marshal stopped her and informed her that only one person per defendant was allowed to

18  enter the courtroom.  Other than identifying him as a Marshal and that he wore a jacket, she

19  cannot describe the individual further.  Ms. Caballero testified she then went back to the

20  courthouse entrance, retrieved her cellphone from the security officer, called Defendant Lanza's

21  mother to tell her not to come to the courthouse from her residence in Canóvanas because she

1   would not be allowed inside the courtroom, turned her cellphone back in to security, and

2   returned to the courtroom.

3        Ms. Caballero testified that she entered the courtroom and sat in the back row along with

4   the mothers of the two other defendants.  According to Ms. Caballero, she and the mothers of

5   Defendant Astacio and Defendant Rivera entered the courtroom prior to the jury venire and

6   remained in the courtroom for the rest of the day, with the exception of the court's recess during

7   the lunch hour. She does not recall seeing chairs next to the benches reserved for the jury venire.

8        Ms. Caballero did not tell anyone, including Defendant Lanza's attorney, that she had

9   been told only one person per defendant would be allowed inside the courtroom.  The first time

10  she discussed the matter was with Attorney Sandoval the day before the evidentiary hearing, that

11  is, over two years after the incident.  Ms. Caballero also testified that she spoke with a male

12  attorney regarding this matter a little earlier.  She could not recall the male attorney's name, but

13  she testified that he spoke to her in English and advised her that Attorney Sandoval would be

14  contacting her.  The day Attorney Sandoval contacted her--or November 19, 2015, which was

15  the day prior to the evidentiary hearing, Ms. Caballero went to Attorney Sandoval's office for a

16  meeting.

17  **C.   Héctor Rivera-Rosa**

18       Héctor Rivera-Rosa is the father of Defendant Luis Daniel Rivera-Carrasquillo.

19  Mr. Rivera arrived at the courthouse early on October 25, 2013, in order to provide a change of

20  clothes to the Marshal for his son to wear during trial.  He was then directed to wait in the

21  cafeteria until the courtroom opened up. Mr. Rivera waited in the cafeteria with his wife and

22  then proceeded to the courtroom around 9:00 a.m. Since the courtroom remained locked, they

1   waited in the atrium for the doors to open.  At some point, a person dressed in a blue blazer and

2   grey pants opened the courtroom door and informed Mr. Rivera and his wife that only one

3   family member per defendant would be allowed inside the courtroom during jury selection. Mr.

4   Rivera testified that the person was somewhat tall, but could not recall his skin color or any

5   identifying characteristics about him. Mr. Rivera did not question the instruction, and resolved

6   to wait out the day on the benches outside the courtroom while his wife entered the courtroom to

7   watch the jury voir dire.

8         According to Mr. Rivera, he remained on the bench outside the courtroom the entire day

9   with the exception of the lunch recess and bathroom breaks. At no point did Mr. Rivera attempt

10  to enter the courtroom, even after lunch. Mr. Rivera testified that Juan Carlos Ramos-Piñeiro,

11  brother of co-defendant Jean Carlos "Jincho" Ramos-Piñeiro, and Defendant Lanza's sister,

12  brother, and other family members also sat on the benches outside the courtroom. Mr. Rivera

13  remained on the bench outside the courtroom until one of the Marshals returned the civilian

14  clothing to him that he had brought for his son to wear.  Throughout his day sitting on the bench,

15  he cannot recall anyone entering or exiting the courtroom with the exception of the lunch recess.

16  He stated at one point he peered into the courtroom door's window but was admonished by

17  someone for doing so.  During that time, he does not recall seeing any chairs set up in the

18  courtroom. Mr. Rivera testified that he was able to enter the courtroom without incident on each

19  day of trial following the day of jury selection.

20        Nearly two years passed before Mr. Rivera discussed the events of October 25, 2013 with

21  José [Morin] over the phone in Spanish. Mr. Rivera testified that José identified himself as

22  Defendant Astacio's attorney.   Portions of Mr. Rivera's testimony do not coincide with

1    statements attributed to him in Mr. Morin's affidavit.  For example, in the affidavit, Mr. Morin

2    asserts that Mr. Rivera stated that he was not allowed into the courtroom on additional days

3    following the day of jury selection, but at the evidentiary hearing Mr. Rivera said he had no

4    trouble on any other day.  Additionally, according to Mr. Morin, Mr. Rivera described the

5    person at the door as a "gentleman, with darker skin but not too dark, wearing a grey suit and tie

6    and black pants." Mr. Rivera then met with Attorney Sandoval the day before the evidentiary

7    hearing to discuss his testimony. He then testified that the man wore a blue blazer and grey

8    pants.

9          Mr. Rivera denies any knowledge or belief that his son was involved in illegal activity

10   prior to his arrest for this matter. Finally, Mr. Rivera testified that he did not recognize any of

11   the persons in the atrium or courtroom on the day of the evidentiary hearing as the person who

12   told them that only one person per defendant could enter.

13   **D.    <u>Maribel Carrasquillo</u>**

14         Maribel Carrasquillo is the mother of Defendant Luis Daniel Rivera-Carrasquillo, and the

15   wife of Héctor Rivera. She arrived at the courthouse with her husband and proceeded to the

16   cafeteria.  Around 9:00 a.m., they came to the courtroom.  Sometime later, a man with grey

17   pants and a blue blazer unlocked the courtroom and announced that only one person per

18   defendant could enter the courtroom.  She cannot identify this person other than his clothing.

19   Ms. Carrasquillo testified that she entered the courtroom along with Ms. Caballero and the

20   mother of Defendant Astacio and that they sat in the back row closest to the wall to the right of

21   the courtroom (looking into the courtroom from the judge's bench).

1    After they sat, a lot of people wearing numbers entered the courtroom and were directed

2    to be seated "on the chairs and benches."  Many of these people would leave throughout the day.

3    After lunch there were less people in the courtroom, but additional people were also entering.

4    Ms. Carrasquillo testified that her husband, Defendant Astacio's brother, another family

5    member of Defendant Astacio, and a family member of Jincho remained outside in the atrium

6    during jury selection. She believed there were around ten people sitting in the atrium outside the

7    courtroom.  Ms. Carrasquillo remained in the courtroom the entire day with the exception of the

8    lunch recess.  She did not communicate anything to her son's attorney regarding her husband not

9    being allowed into the courtroom.  She and her husband had found and hired her son's attorney.

10   Contrary to Mr. Morin's affidavit, Ms. Carrasquillo testified that she did not speak with

11   José [Morin] over the phone.  The first time she told her story was to Attorney Sandoval the day

12   before the evidentiary hearing – over two years after the alleged events occurred.

13   Finally, Ms. Carrasquillo testified that she was aware that her son was involved in illegal

14   drug activity prior to his arrest.

15   **E.      Attorney José Aguayo**

16   Attorney José Aguayo represented Defendant Lanza in his defense at the District Court

17   level, including his defense at trial.  Attorney Aguayo testified that he has no knowledge about

18   any members of the public being kept from entering the courtroom on October 25, 2013.  No

19   one ever approached him regarding a concern of being excluded from the courtroom during jury

20   selection.  None of the other defense attorneys ever mentioned to him that there was an issue

21   with public being kept from the courtroom. Attorney Aguayo testified that as people were

22   eliminated from the venire they exited the courtroom.  He testified that he cannot recall who the

1   CSO was that day, but he recalls the CSO walking around the courtroom with a microphone to

2   assist the potential jurors during voir dire.

3   **F.    Francisca Espino**

4          Francisca Espino is the mother of Defendant Edwin Bernard Astacio-Espino. On

5   October 24, 2013, she and her daughter-in-law, Milagros Ajana, arrived at the courthouse early

6   to deliver civilian clothes for her son to wear. They then went to the cafeteria to wait until the

7   courtroom opened.   Around 9:00, Ms. Espino and Ms. Ajana approached the door of the

8   courtroom to enter, but were stopped by a person who said that only one person per defendant

9   could enter. Ms. Espino cannot describe the individual who made this statement. Defendant

10  Astacio's half-brother also wanted to enter the courtroom, but they decided that Ms. Espino

11  should be the one to go inside to watch.  She entered the courtroom and sat in the back row on

12  the left.

13         She remained in the courtroom until the lunch recess.  Defendant Astacio's half-brother

14  then left the courthouse. Ms. Ajana remained the entire day.  After lunch, Ms. Espino reentered

15  the courtroom and took her same seat at the left of the back bench. She does not know who sat

16  beside her. Throughout jury selection people entered and exited through the courtroom door.

17         Ms. Espino first discussed the events that occurred on October 25, 2013, with Attorney

18  Sandoval on November 19, 2015, the day before the evidentiary hearing.  Prior to that, she had

19  never discussed it with anyone.  She testified that though she spoke with José [Morin] on many

20  occasions, she never discussed whether people could enter or leave the courtroom. Ms. Espino

21  denies making any of the statements attributed to her in Morin's affidavit.

1   **G.     Juan Carlos Ramos-Piñeiro**

2        Juan Carlos Ramos-Piñeiro is the brother of co-defendant Jean Carlos "Jincho" Ramos-

3   Piñeiro and the childhood friend of Defendant Ramón Lanza-Vázquez and Defendant Luis

4   Rivera-Carrasquillo.  He arrived at the courthouse on October 25, 2013, because he thought his

5   brother was beginning trial that day.   When he learned that his brother was not in trial,

6   Mr. Ramos remained at the courthouse in order to see Defendant Lanza and Defendant Rivera.

7   He watched a large jury pool enter the courtroom.  When he attempted to enter the courtroom, a

8   man wearing a blue blazer and grey pants told him that he was not allowed to enter since he was

9   not family or a member of the jury.  Mr. Ramos testified that he pointed to an empty bench

10  behind the prosecutor's table and asked why he couldn't sit there and that the man told him that

11  the bench was reserved for the press.  He testified that when he looked inside the courtroom

12  there were no chairs in the aisle or well.

13       Mr. Ramos arrived at the courthouse with his sister, who stayed with him sitting on the

14  benches outside the courtroom.  He testified that there were four people total sitting on the

15  benches outside the courtroom. He waited until noon and then left. He did not return to watch

16  any of the remainder of the trial. Mr. Ramos did not attend jury selection for his brother's trial.

17       Mr. Ramos testified that he grew up with Defendant Lanza and Defendant Rivera in the

18  public housing project and that they were his "muchachos", or "boys".  He further testified that

19  despite his relationship with them he was unaware that his brother was a leader of La ONU or

20  that Defendant Lanza and Defendant Rivera were involved with La ONU.

21       Mr. Ramos testified that he does not recall being interviewed by José Morin and denied

22  making all of the statements attributed to him in Morin's affidavit.

Civil No. 3:12-CR-00200 (JAF)                                                                        -18-

## H.      <u>Héctor Villavicencio</u>

Héctor Villavicencio was the Court Security Officer working in the courtroom on October 25, 2013. His responsibilities included having a general awareness of any security issues, directing the members of the venire where to sit, and walking around the courtroom among the jury venire with a microphone for them to use when answering questions from the court or counsel. CSO Villavicencio testified that he opened the courtroom at around 9:00 a.m., that the public was granted access and that the courtroom remained open during the jury selection proceedings. He denied telling anyone they could not enter or that only one family member per Defendant could enter. He also stated there were no incidents or complaints made that day that a family member or the general public was not being granted access. CSO Villavicencio testified that it was the known procedure of the undersigned that members of the public may enter the courtroom and sit in the designated space.

CSO Villavicencio testified that during jury selection on October 25, 2013, the courtroom was set up with the ten chairs in front of the jury box and the eight chairs next to the designated jury benches.  He testified that during jury selection there were three benches designated for public seating and these were the benches located on the left of the courtroom (the side behind the Defense table) and half of the long bench at the back of the courtroom.  He verified that Court Exhibits 1-5 adequately represented the setup of the courtroom on October 25, 2013. CSO Villavicencio also testified that in multi-defendant trials such as this one it was the procedure of the undersigned to set up the courtroom with the additional seating for the venire and post signs designating the specific seating areas.

1   **I.**   **Ana Romero**

2   Ana Romero was the Courtroom Deputy Clerk for the undersigned on October 25, 2013.

3   Ms. Romero testified that Court Exhibits 1-5 adequately represented the courtroom set up on

4   October 25, 2013.  She testified that the signs were already posted on the benches when she

5   entered into the courtroom that morning.  She testified that the potential jurors sat in the jury

6   box, the benches and chairs in front of the jury box, in each of the benches located on right side

7   of the courtroom (behind the prosecutor's table), and in the chairs beside those benches.

8   Ms. Romero testified that while members of the public were seated in the benches designated for

9   the public, it never appeared so full that no additional persons could fit.

10  **J.**   **Statement from Attorney Lydia Lizarribar (Defense Ex. 1)**

11  Defendants also entered into evidence a sworn statement of Lydia Lizarribar, trial

12  counsel for Defendant Luis Rivera-Carrasquillo.  Attorney Lizarribar states that at no time

13  during jury selection was she made aware that persons were being excluded from the courtroom.

14  Additionally, she states that at no point following the jury selection was it brought to her

15  attention that anyone had been excluded from the courtroom.

16                                            **V.**
17                                        **Case Law**

18  *Presley v. Georgia*, 558 U.S. 209 (2010). In *Presley*, the court excluded the defendant's

19  uncle from witnessing the jury selection. *Id.* at 210. Defense counsel objected to the court's

20  exclusion, and the court explained that there was not room for the uncle in the courtroom due to

21  the number of potential jurors.  *Id.*  After the jury convicted the defendant, he moved for a new

22  trial based on the exclusion of his uncle from the jury selection process.  *Id.*  The court held a

1    hearing on the motion and defendant presented evidence that there was, indeed, enough room in

2    the courtroom for his uncle to have been allowed in. *Id.* at 211.   Nonetheless, the court denied

3    the motion for a new trial. *Id.* Georgia's appellate court and Supreme Court affirmed the ruling.

4    *Id.* The Supreme Court of the United States reversed the judgement of the Supreme Court of

5    Georgia and expressly stated that the Sixth Amendment right to trial extends to the jury venire

6    process. *Id.* at 213.

7         *United States v. Agosto-Vega*, 617 F.3d 541 (1st Cir. 2010).   The jury trial in *Agosto-*

8    *Vega* began on June 18, 2008, prior to the *Presley* decision.   *Id*. at 544.   Before jury selection,

9    defense counsel brought to U.S. District Judge Carmen Cerezo's attention that the CSO was not

10   allowing defendant's family into the courtroom to witness jury selection.   *Id.* The judge

11   responded that the courtroom was full of jurors and there was not room for anyone other than

12   the venire.   *Id*.   Following jury selection, defense counsel again raised the issue of the

13   defendant's family members not being allowed to enter the courtroom during jury selection,

14   even as room was made by the departure of several members of the venire.   *Id*. at 544-45.   After

15   a sixteen-day trial, the jury convicted the defendant on all counts. *Id*. at 545. On appeal,

16   defendant requested that the convictions be vacated and the case remanded for a new trial, since

17   the exclusion of the public from the courtroom violated the Sixth Amendment right to a public

18   trial.   *Id*.   Having the benefit of the *Presley* decision to guide it, the First Circuit found that the

19   trial court's full closure of the courtroom during jury selection violated defendant's Sixth

20   Amendment right. *Id* at 548.

21        *United States v. Negrón-Sostre*, 790 F.3d 295 (1st Cir. 2015). The jury trial in *Negrón-*

22   *Sostre* began on January 20, 2010, one day following the *Presley* decision and well before the

1    *Agosto-Vega* decision, in front of Judge Francisco Besosa.  *Id.* at 300 & 302.  The defendants

2    appealed their convictions and moved in March of 2011 to supplement their record, alleging, for

3    the first time, "that they were denied their right to a public trial when their family members were

4    excluded from the courtroom during jury voir dire." *Id.* at 300.  The district court held an

5    evidentiary hearing on July 6, 2011, and issued a memorandum in December 2011, finding that

6    "[n]o specific evidence was ever presented, … that demonstrated that [a] supposed long standing

7    district policy of not allowing the public into the courtroom during voir dire was ever followed

8    in this case." *Id.* at 300.

9        No members of the public were allowed inside the courtroom during jury selection.

10   Multiple family members testified as such.  *Id.* at 302.  The CSO present inside the courtroom

11   admitted that he did not allow friends or family members inside the courtroom during jury

12   selection.  *Id.*  Several of the defense attorneys for the defendants also testified that it was

13   common practice that family members were not allowed inside the courtroom for jury selection.

14   *Id.* at 303.  Similar to *Agosto-Vega* and *Presley*, *Negrón-Sostre* involved a complete closure

15   where no member of the public was allowed inside the courtroom during jury selection. The

16   First Circuit found that the closure of the courtroom for jury voir dire was a "plain and obvious

17   error", a structural error that required that the convictions be vacated and the matter remanded

18   for a new trial. *Id.* at 306.

19       *Bucci v. United States* involved a partial courtroom closure where courtroom access was

20   restricted to three specific members of the public selected by a court employee.  662 F.3d 18 (1st

21   Cir. 2011).  The First Circuit's decision in *Bucci* came after both of the jury trials in *Negrón-*

22   *Sostre* and *Agosto-Vega. Id.* (decided Oct. 13, 2011).  As in *Negrón-Sostre*, defense counsel did

1   not raise any objection to the partial closure either at trial or on direct appeal.  The trial court

2   first reviewed the partial closure as a § 2255 petition.  After the trial court found that there was

3   no Sixth Amendment violation, Bucci appealed to the First Circuit.  Finding that Bucci's Sixth

4   Amendment claim was procedurally defaulted for lack of "cause" being demonstrated, the Court

5   of Appeals did not decide the merits of the Sixth Amendment claim. *Id.* at 29.  The Circuit noted

6   that "whether a partial public trial violation," like a partial closure found in *Bucci*, constitutes

7   structural error remains an "open question". *Id*.  The Court noted, however, that "[t]here is also a

8   problem here with court personnel handpicking only select members of the defendants' families

9   to remain in the courtroom while the general public was excluded." *Id*. at 27.

10         In most of the above cases, the court was fully aware of the partial or complete closure of

11   the courtroom during jury voir dire. In *Presley*, the court ordered all non-jurors, of which the

12   defendant's uncle was the sole public audience member, to leave the courtroom during voir dire.

13   In *Agosto-Vega*, defense counsel alerted the trial court that the CSO was not permitting public to

14   enter the courtroom. 617 F.3d at 544. The trial court thereafter explained that there was not

15   room for persons in addition to the venire. *Id.* In *Bucci*, the court instructed the courtroom

16   deputy clerk to accommodate the defendant's right to a public trial despite the courtroom being

17   nearly full to capacity.  662 F.3d at 24.  The courtroom deputy then specifically invited three

18   members of the public to return and watch the voir dire.  *Id.*

19         Only in *Negrón-Sostre* was the closure of the courtroom the result of inaction by the

20   judge. 790 F.3d at 304.  However, in that case the CSO testified that it was his practice to close

21   the courtroom to the public for jury selection.  *Id*. at 302.  Additionally, three defense attorneys

Civil No. 3:12-CR-00200 (JAF)                                                                    -23-

testified that it was common for the courtroom to be closed to the public for jury selection so

they did not think it strange or in violation of their clients' rights. *Id.* at 302-03.

# VI.
## Analysis

Defendants have not shown that their family members were denied entry into the

courtroom the day of jury selection.  Through their witnesses, Defendants attempt to show that

on the date of the jury selection, at around 9:00 a.m., prior to the potential jurors entering the

courtroom, they were told by a courtroom officer that only one family member per defendant

was allowed to enter the courtroom. Their testimony, however, is highly suspect given the clear

bias of the witnesses, the time that has lapsed since trial, and the discrepancies in the testimony.

Each of the five family/friend witnesses had much to gain by alleging that they were

prevented from entering the courtroom.  We note first that of these five, three of them do not

dispute that they entered the courtroom and watched the entirety of jury voir dire.  Three of the

five witnesses are parents of Defendants and all five are aware that the Defendants will remain

in prison for the remainder of their lives, absent some reason for their conviction being

overturned.  Ms. Caballero is the longtime girlfriend of Defendant Lanza and the mother of his

two children.  Despite his life sentence, she continues to maintain a relationship with him for the

benefit of their daughters, who will never see their father outside of a prison. The fifth witness,

Juan Carlos Ramos-Piñeiro also demonstrated bias as he has been a friend of two of the

Defendants since his childhood and his own brother is a co-defendant in the matter.

Nearly two years lapsed before any of these witnesses alleged that someone had limited

their entry to one person per defendant.  First, this alleged limitation is nonsensical since there

1    were three benches available specifically for the public.  Second, this issue only arose *after*

2    appellate counsel reviewed the First Circuit's opinion in *Negrón-Sostre*, *supra*, two years after

3    the alleged event. After reviewing *Negrón-Sostre*, appellate counsel reviewed the transcript of

4    the jury trial and <u>found *no* evidence of a closed courtroom</u>: No discussions were had, no

5    objections were lodged, no indications at all that the courtroom was closed or public access was

6    limited.  Thereafter, on  August 28, 2015, they contacted Defendants' family members through

7    José Morin; after explaining the reason for the calls and what would happen if the court finds

8    that a closure of the courtroom occurred, these family members suddenly recalled limitations for

9    entering the courtroom during jury selection two years earlier.

10          Not surprisingly, three of the five witnesses admit that they were not, in fact, excluded

11    from the courtroom at all and witnessed the entire jury selection.  Of the people that were

12    supposedly turned away, only two came forward with any story, and their versions at the

13    evidentiary hearing greatly differed from the versions allegedly told by them to José Morin.

14    Additionally, there is so much disparity between the Defense witnesses' descriptions that it is

15    difficult to consider any of their testimony credible. For example, Mr. Ramos-Piñeiro testified

16    that four people sat on the benches outside the courtroom, while Ms. Carrasquillo recalls seeing

17    around ten people who were excluded.  Mr. Rivera, who sat outside the courtroom doors for the

18    entire day, testified that he never saw anyone leave or enter the courtroom, but the testimony of

19    at least five other witnesses described that potential jurors were consistently leaving the

20    courtroom through the unlocked door as they were eliminated. Additionally, Ms. Carrasquillo,

21    Ms. Caballero, and Ms. Espino do not agree on whether they entered the courtroom together,

22    whether they sat together, or where they sat once inside the courtroom.

1       Also, none of defense witnesses recognized CSO Villavicencio as the individual who

2   limited entry to one person per defendant.  Prior to the evidentiary hearing, CSO Villavicencio

3   was seated in the courtroom along with the defense witnesses.  After Defendants requested the

4   separation of witnesses, CSO Villavicencio and the defense witnesses waited at the atrium of the

5   courthouse for their turn to be called to testify.  Despite being in close proximity throughout the

6   day, none of the defense witnesses identified CSO Villavicencio as the individual who limited

7   their entry. Notably, CSO Villavicencio was the CSO assigned to Courtroom #7 for the entirety

8   of the trial.  Mr. Rivera testified that the man who kept him from entering was the same man

9   who announced the judge's entry into the courtroom on the following days.   Despite this,

10  Mr. Rivera did not identify CSO Villavicencio, who had been sitting in the atrium on

11  November 20, 2015, along with the other witnesses awaiting being called to testify, as the

12  person who had excluded him on October 25, 2013.

13      Conversely, the testimony of CSO Villavicencio and Courtroom Deputy Romero provide

14  consistent descriptions of the events of the jury selection process on October 25, 2013.  Both

15  CSO Villavicencio and Courtroom Deputy Romero were present throughout the jury selection

16  process. CSO Villavicencio and Courtroom Deputy Romero testified that Court Exhibits 1-5

17  adequately depict the setup of Courtroom 7 on October 25, 2013.  That the defense witnesses do

18  not recall seeing chairs inside the courtroom is insignificant;  an individual allegedly peering in

19  through the small square of glass of the courtroom door would hardly be able to distinguish the

20  type of seat that each of the ninety-four people sat upon.  Ms. Caballero, Ms. Carrasquillo, and

21  Ms. Espino, who were present for the entirety of jury selection, could not say one way or

22  another whether the chairs were present that day.

1    CSO Villavicencio opened the courtroom at around 9:00 a.m., allowing the public to

2    enter and the courtroom remained opened during the jury selection proceedings. He denied

3    telling anyone they could not enter or that only one family member per Defendant could enter.

4    He also stated there were no incidents or complaints made that day that a family member or the

5    general public was not being granted access. According to his uncontested testimony, the

6    procedure used to seat the jury and designated area for public was the same procedure that is

7    typically used during jury selections in multi-defendant cases before the undersigned.

8    Given CSO Villavicencio's unequivocal testimony that he did not prevent public from

9    entering the building and Defense witnesses' inability to describe the person other than his

10   clothing or identify CSO Villavicencio as the person who prevented them from entering the

11   courtroom, Defendants may suggest that perhaps it could have been one of the other security

12   officers in court that day who prevented the public entry. What Defendants refuse to see is that

13   no closure, partial or otherwise, occurred;[2] as elucidated by CSO Villavicencio, that is not the

14   way the undersigned presides over his cases. In fact, Attorney Sandoval, who has appeared in

15   front of this judge on multiple occasions, acknowledged during the hearing that the undersigned

16   is a "details man" and is directly involved in running his courtroom.  CSO Villavicencio agreed

17   with Attorney Sandoval's statement and further testified that the undersigned gave him specific

18   instructions that the public be allowed to enter the courtroom and that is why there were three

19   benches specifically designated as public seating.

---

[2] Even if we were to believe the story told by Defense witnesses that some unnamed, indescribable person indicated to them that only one member of each Defendant's families would be allowed into the courtroom, there is no testimony that this court personnel specifically chose which of the family members it would be.  *See Bucci*, 662 F.3d at 27.  Defense witnesses' stories agree that they were the ones who chose who would go inside to watch the voir dire.

1        Unlike the facts of *Negrón-Sostre*, CSO Villavicencio testified that, at the instruction of

2    this court, it was his practice to allow the public in the courtroom for jury selection. There is no

3    testimony that it was common for the courtroom to be closed to the public for jury selection; in

4    fact, CSO Villavicencio testified that it was the undersigned's practice to specifically designate

5    areas to be available for the public.

6        It is the opinion of this court that Defense counsel is attempting to create an issue where

7    one does not exist. Having been present during jury voir dire, something that none of appellate

8    counsel is able to claim, this court is in the best position to determine the credibility of the

9    witnesses who testified on behalf of both the Defense and the Government.   On October 25,

10   2013, ninety-four members of the venire sat in their designated area.  There were another three

11   benches, up to twenty-five seats, designated for public use. Members of the public, including at

12   least three family members of Defendants, sat in those seats.

13       Attorney Sandoval insinuates that the court is incorrect about the amount of people who

14   can fit into Courtroom #7. (See ECF No. 1728-1). The memorandum from the Clerk's Office

15   Project Manager, however, demonstrates that such is possible, especially for the limited

16   timeframe of jury voir dire, during which time potential jurors are frequently dismissed and exit

17   the courtroom.

18       Moreover, this court recently empaneled a jury in Criminal Case No. 3:15-CR-00462.

19   The courtroom setup was the same as depicted in Court Exhibits 1-5.  That venire consisted of

20   ninety members, all of whom fit in the area designated for the jury.  The same three benches

21   were designated for the public. Similar to the voir dire in the instant matter, the public benches

Civil No. 3:12-CR-00200 (JAF)                                                                -28-

1    were occupied, but not full to the point of excluding any members of the public – family,

2    friends, or otherwise.  Accordingly, Attorney Sandoval's insinuation carries no weight.

3        Furthermore, any suggestion that the court should have considered holding jury selection

4    in another courtroom in order to have room for public spectators is without merit.  With the use

5    of the additional chairs, Courtroom #7 has enough seating capacity to accommodate a 94-

6    member venire and still leave three entire benches for public use.  The fact of the matter is that

7    those three benches are rarely filled.  It is the experience of this court that very rarely do more

8    than ten persons occupy the public seating area during jury selection – even in multi-defendant

9    litigation.  For example, during the recent jury selection in Criminal Case No. 3:15-CR-00462,

10   which involved five defendants proceeding to trial, only six people occupied the public area for

11   the majority of time.  At one point, two additional people entered the courtroom to watch voir

12   dire, but at no time were there more than eight people occupying the three benches reserved for

13   the public.

14       Although the above example is merely illustrative, it coincides with Courtroom Deputy

15   Clerk Romero's testimony that on the day of jury selection, the public benches were occupied

16   but never filled.  This court cannot say which members of the public occupied the three public

17   benches on October 25, 2013; perhaps they were family members or friends of the victims or of

18   Defendants, perhaps they were concerned members of the public, perhaps they were members of

19   the media, or perhaps they were family and friends of Defendants or their co-defendants.  It is a

20   fact, however, that family/friends of each defendant watched the entirety of jury voir dire.  It is

21   also a fact that neither this court, nor any officer of this court, singled out or determined who

1    could and who could *not* enter the courtroom. If any decision was made, and this court is wary

2    of believing Defense's Swiss cheese story, it was made by the families of Defendants.

3                                             **VII.**
4                                     **Findings of Fact**

5           The court enters the following findings of fact:

6    1.  The jury trial for Defendants Edwin Bernard Astacio-Espino (2), Luis D. Rivera-

7        Carrasquillo (3), and Ramón Lanza-Vßzquez (18), including jury selection on

8        October 25, 2013, occurred in Courtroom #7 of the Clemente Ruiz-Nazario Courthouse

9        in San Juan, Puerto Rico.

10   2.  The venire for October 25, 2013, consisted of ninety-four (94) potential jurors.

11   3.  On October 25, 2013, the courtroom had two chairs next to each of the long spectator

12       benches, increasing the seating capacity in the spectator area by ten.

13   4.  A 9'9" bench was designated for U.S. Marshals directly behind the table for Defendants'

14       counsel.

15   5.  There are five (5) spectator benches measuring fourteen feet and ten inches (14'10")

16       labeled for "Jury". Each spectator bench can seat ten people.

17   6.  One (1) long spectator bench in back of courtroom measuring thirty-one feet and eight

18       inches (31'8") of which thirteen feet and two inches (13'2") were labeled for "Public".

19       The section labeled for public can seat nine people.

20   7.  The capacity in the spectator area (not including the U.S. Marshals bench) on October 25,

21       2013, was eighty-five (85).  Sixty (60) of the seats were occupied by the jury venire. The

22       seating area designated for "Public" could seat up to twenty-five (25) people.

8.  The Jury Box has nine (9) chairs per row for a total of eighteen (18) chairs.

9.  There are two small benches in front of the jury box measuring four feet and eleven inches (4'11"). Together they can seat between six to seven people.

10. Ten (10) chairs were set up in front of the two small benches in front of the jury box.

11. The jury box, small benches, and chairs in front of the bench seated an additional thirty-four (34) members of the venire.

12. The total amount of seating reserved for members of venire was ninety four (94).

13. The total amount of seating reserved for members of the public was twenty-five (25).

14. CSO Villavicencio unlocked the courtroom door sometime after 9:00 a.m. to allow public to enter the courtroom.

15. The courtroom door remained unlocked throughout jury voir dire.

16. Members of the public were allowed to enter the courtroom and watch the jury voir dire.

17. At least three of the five family member/ friend witnesses called by the Defense to testify, that is Betzaida Caballero, Maribel Carrasquillo, and Francisca Espino, witnessed the jury voir dire in its entirety and observed while potential jurors were excused from serving and exited the courtroom through the unlocked door.

18. No person alerted any defense counsel that a security officer or other officer of the court had prevented them from entering the courtroom either on the day of jury selection or at any point.

19. The first time this matter was raised by any of the witnesses was, at the earliest, August 28, 2015, when they were contacted by José C. Morin on behalf of appellate counsel for Defendant Astacio.

Civil No. 3:12-CR-00200 (JAF)                                                    -31-

1       Though Defense counsel suggested that this court's memorandum be limited to findings

2    of fact, we would be remiss if we did not specifically make a determination as to whether the

3    courtroom was "partially closed" during voir dire on October 25, 2013.  See *Negrón-Sostre*, 790

4    F.3d at 304 (critical of the trial court's findings which did not "specifically determine that the

5    courtroom was *not* closed.").   Accordingly, we find that the courtroom was not closed, neither

6    partially nor fully and neither expressly nor impliedly, during the jury voir dire on October 25,

7    2013.   Because we find that no closure of the courtroom occurred, a review of whether we

8    looked at other alternatives (*See Presley*, 558 U.S. at 214) is irrelevant. The courtroom was

9    open, and there were three benches available for members of the public to use.

10                                        **VIII.**
11                                    **Conclusion**
12
13       For the aforementioned reasons, this court concludes that Courtroom #7 was not closed,

14   neither partially nor fully and neither expressly nor impliedly, during the jury voir dire on

15   October 25, 2013.

16       **IT IS SO ORDERED.**

17       San Juan, Puerto Rico, this 11th day of December, 2015.

18                                               S/José Antonio Fusté
19                                               JOSE ANTONIO FUSTE
20                                               U. S. DISTRICT JUDGE